## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

### A. Introduction

1. I, Task Force Officer Ben Takala, being duly sworn under oath, states as follows:

2. I am employed by the Marquette City Police Department.  I am a certified police officer in the State of Michigan and have been so for approximately 13 years.  I am currently assigned to the multi-jurisdictional drug task force known as the Upper Peninsula Substance Enforcement Team ("UPSET").  My primary duties on UPSET are to investigate and interdict the illegal manufacturing and trafficking of controlled substances.  I have been on UPSET for approximately one year.  I am also a federally deputized Task Force Officer with the Federal Bureau of Investigation ("FBI") with the authority to seek and execute federal criminal process, including search warrants, alleging violations of Title 21 of the United States Code.

3. While working as a patrol officer and a detective on UPSET, I have been involved in multiple investigations involving illegal manufacturing, transportation, distribution, and possession of controlled substances.  I am familiar with methods used to finance drug transactions and traffic illegal drugs. I presently work in conjunction with other federal and local law enforcement officials and agencies investigating drug trafficking throughout the United States.  I have attended numerous trainings including Michigan State Police ("MSP") Undercover Narcotics School, Raid Entry School, Clandestine Laboratory Responder Training, Clandestine Lab Site Safety Officer, Interdiction Mastermind via Street Cop Training and ACE Interdiction Consensual Encounters and Parcel Interdiction.

4. Through my training and personal experience, I have become familiar with the identification of illegal controlled substances, including, heroin, fentanyl, crystal methamphetamine and cocaine, and I am familiar with illegal drug terminology, packaging, and trafficking. I have been involved in and conducted numerous narcotics investigations into the possession, sale, transportation, and distribution of controlled substances in the State of Michigan. I am aware of the following information from numerous sources including but not limited to, my own personal observations and participation in this investigation and my review and analysis of oral and written reports. This Continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this Continuation, there is probable cause to believe that violations of Title 21, United States Code, Sections 846, 841(a)(1) have been committed by Michael FLETCHER, Alexis Cruz ACEVEDO, Sierra LAITINEN, and Amy Lil KANGAS, and further, there is probable cause to believe that evidence of those crimes will be found during a forensic examination of the three

listed cell phones (collectively, "SUBJECT DEVICES"), more fully described in Attachment A and below.  This Continuation is made for the purpose of establishing probable cause in support of a search warrant for the "SUBJECT DEVICES", for evidence and instrumentalities of these crimes.

6. This search warrant seeks authorization to search the cellular telephones described in Attachment A (the "SUBJECT DEVICES"). The SUBJECT DEVICES are more particularly described as follows:

- SUBJECT DEVICE 1 is a purple in color Motorola Cellphone. S/N and IMEI numbers not known, seized from Sierra Paige LAITINEN, during an arrest on March 30th, 2026 related to the superseding indictment in W.D. Mich. Case No. 2:26-CR-01 for alleged violations of Title 21, United States Code, Sections 846, 841 (a)(1). SUBJECT DEVICE 1 is pictured immediately below:



- SUBJECT DEVICE 2 is a white in color AT&T Verge 2 with a heavily damaged front glass screen,  S/N and IMEI numbers not known, seized from Amy Lil KANGAS during an arrest March 30th, 2026 related to the superseding indictment in W.D. Mich. Case No. 2:26-CR-01 for alleged violations of Title 21, United States Code, Sections 846, 841 (a)(1) SUBJECT DEVICE 2 is pictured immediately below):



- SUBJECT DEVICE 3 is a white in color AT&T Verge 2, S/N and IMEI numbers not known, seized from Amy Lil KANGAS during a retail fraud arrest on February 25, 2026. SUBJECT DEVICE 3 is pictured immediately below:



7. The SUBJECT DEVICES are currently in the possession of UPSET.  As further

described below, SUBJECT DEVICE 1 came into law enforcement's possession after it was seized by UPSET from LAITINEN'S person during her arrest for the superseding indictment against LAITINEN and others alleging violations of Title 21, United States Code, Sections 846, 841(a)(1) in W.D. Mich. Case No. 2:26-CR-01.

8. SUBJECT DEVICE 2 came into law enforcement's possession after it was seized by UPSET from KANGAS's person during her arrest for the superseding indictment against KANGAS and others alleging violations of Title 21, United States Code, Sections 846, 841(a)(1) in W.D. Mich. Case No. 2:26-CR-01

9. SUBJECT DEVICE 3 came into law enforcement's possession after it was seized from Amy KANGAS's person during her arrest for Retail Fraud on February 25, 2026. I (Det. Takala) seized it from Amy KANGAS's after speaking with her after she expressed interest in talking with officers about her criminal activities.  I spoke with her prior to her being lodged at Marquette County Jail.

10. I know that the SUBJECT DEVICES have been maintained such that they are in the same condition as when they came into law enforcements' possession.

11. Based upon my training and experience in drug trafficking investigations and the related money laundering activity associated with these investigations that most always involve the concealment of funds and assets from the detection of government agencies, I know that:

   a. That when persons involved in illegal drug trafficking or money laundering activities amass large amounts of proceeds from the sale of drugs, the traffickers will frequently attempt to legitimize these profits. That to accomplish these goals, drug traffickers and money launderers utilize domestic and foreign banks and/or financial institutions and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, "shell" corporations, and business "fronts." This information is commonly retained on a cellular phone;

   b. That drug traffickers and money launderers commonly retain records of their financial transactions, including money order receipts, cashier's checks, titles, deeds, automobile titles and registrations, hotel and airline receipts and wire transfer receipts.  These records are often stored on cellular phones. These records are often retained for a number of years;

   c. That individuals involved in drug trafficking and money laundering activities commonly maintain addresses or telephone numbers in their cellular phones which reflect names, addresses and/or telephone numbers of their suppliers, customers and criminal associates in drug trafficking, and often possess photographs of other co-conspirators. These records are often retained for a number of years;

4

d. That individuals involved in drug trafficking and money laundering commonly use their cellular phones to aid them in their drug trafficking activities. Through computer forensic examination, I know that law enforcement experts can recover material from cellular phones, to include items/documents/files that the user has attempted to delete;

e. Drug traffickers commonly maintain addresses, or telephone numbers in in their cellular phones which reflect names, addresses and/or telephone numbers of their criminal associates in drug trafficking;

f. Drug traffickers commonly communicate with their co-conspirators through their cell phones (including through voice communication and typed communication, e.g., text messages and social media messages, like Twitter and Facebook) and that these communications can be recovered from the device, like the devices, including through forensic examination, which can often recover communications that the user has or has attempted to delete;

g. Drug traffickers will often maintain ledgers for both drug and drug proceeds at their residence in order to keep an accurate accounting of each customer's unique and often changing status (i.e. amount of drugs provided to customer or amount of money paid by customer) and that these records are sometimes kept in electronic form on their cellular phones;

h. That individuals engaged in money laundering for a drug trafficking organization have electronic documents related to their illegal activity on their cellular phones, e.g., bank deposit slips, bank account statements, etc. Like with drug traffickers, I know that individuals engaged in this illegal activity have this evidence on their cellular phones for months, if not years, after the illegal activity such as e-mail correspondence from banks and/or other financial institutions about deposits/transactions;

i. That individuals involved in drug trafficking and/or the laundering of drug proceeds often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, passports and other papers relating to the transportation, importation, ordering, sale and distribution of controlled substances, and the laundering of the resulting drug proceeds, and that these are likewise kept in electronic form on electronic devices like cellular phones;

j. That drug traffickers and money launderers commonly retain records of their financial transactions, including money order receipts, cashier's checks, titles, deeds, automobile titles and registrations, hotel and airline receipts and wire transfer receipts. These records are often stored on

5

computer media, including cellular phones or "smart" phones, or on media capable of being read by computers. These records are often retained for a number of years;

k. That individuals involved in drug trafficking and money laundering activities commonly maintain addresses or telephone numbers in books or papers or electronic media (e.g., cellular phones or "smart" phones) which reflect names, addresses and/or telephone numbers of their suppliers, customers and criminal associates in drug trafficking, and often possess photographs of other co-conspirators. These records are often retained for a number of years; and

l. That individuals involved in drug trafficking and money laundering commonly use cellular phones to aid them in their drug trafficking activities. Through computer forensic examination, I know that law enforcement experts can recover material from cellular phones, to include items/documents/files that the user has attempted to delete.

12. I respectfully submit the information set forth below establishes probable cause to believe that Sierra Paige LAITINEN and Amy Lil KANGAS, and others committed the crimes of Distribution of Methamphetamine and Possession with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Section 841, and Conspiracy to Distribute and to Possess with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841, and that evidence, as described in Attachment B, of those crimes will be located on the SUBJECT DEVICES, as described in Attachment A.

## B. Investigation

13. In August of 2025, I began investigating Michael Paul Fletcher Jr. and others for Conspiracy to Distribute Methamphetamine.

14. On March 25, 2026, a grand jury returned a superseding indictment in Case No. 2:26-CR-01, charging Sierra LAITINEN, Amy KANGAS, Michael FLETCHER and 3 others with a Methamphetamine Conspiracy in violation of Title 21, United States Code, Sections 846, 841(a)(1).

15. During the investigation, I reviewed two phone extractions of phones seized from Michael FLETCHER'S person. The messages detailed below were found on those phones.

16. Cooperating Defendant 1 ("CD1") provided information against KANGAS, LAITINEN, FLETCHER, and others, in exchange for potential consideration on a pending felony-controlled substance charge. CD1 does not have any prior adult criminal convictions. I believe that CD1's information was credible and reliable because it was consistent with other evidence collected as part of the investigation.

17. CD1 reported that KANGAS worked with FLETCHER to distribute methamphetamine during the late summer of 2025 through November 2025, with the exception of when FLETCHER was in custody or in treatment in September and October 2025.  CD1 reported that they personally saw FLETCHER provide methamphetamine to KANGAS and that she heard KANGAS talk about distributing methamphetamine and heard FLETCHER talk about KANGAS distributing methamphetamine for FLETCHER.  CD1 also reported that LAITINEN sent money for FLETCHER to the Texas-based supplier.  CD1 reported that at the time FLETCHER was getting methamphetamine from a Texas-based source of supply named "Ace."

### *Sierra Laitinen*

18. Messages were reviewed between Michael FLETCHER and Sierra LAITINEN. The following message on August 30,  2025 is from Sierra LAITINEN to Michael FLETCHER saying, "Look what came while we were sleeping". The picture sent is of a FedEx Box from Alexis ACEVEDO. Based on shipping records, a package was delivered to LAITINEN's address on Greenwood Street in Ishpeming, MI on or about that date.  (As noted below, LAITINEN later admitted that she received packages for FLETCHER at that address and saw three packages containing methamphetamine.)



19. A message between FLETCHER and LAITINEN from September 9th, 2025 was recovered from FLETCHER'S Facebook Messenger account. The following is a screenshot sent to FLETCHER by LAITINEN showing that "Senjamin Laitinen" had sent money to "Ale Ace." I reviewed the account information for "Ale Ace," which showed it belonged to ALEXIS CRUZ ACEVEDO.

7



20. Based on interviews with LAITINEN in September 2025 and March 2026, she was aware that she was sending money to ACEVEDO for methamphetamine that ACEVEDO had sent via UPS and/or FedEx to Marquette County.

21. A review of messages between LAITINEN and FLETCHER show that LAITINEN had contact or knew how to get in contact with ACEVEDO and was clearly sending money to ACEVEDO for FLETCHER.





22. On March 25th, 2026, I conducted a mirandized interview with Sierra LAITINEN at the Ishpeming Police Department. DEA S/A Akerley was also present during the interview. LAITINEN advised the following. The following is not the full interview and only a brief synopsis of what was told to investigators.

- She was aware that ACEVEDO took over for MONTEMAYOR in sending packages containing crystal meth

- FLETCHER had packages sent to multiple locations including her residence on Greenwood Street in Ishpeming, MI

- She admitted to sending a few thousand dollars to ACEVEDO

- Admitted she has a gambling problem and gambled a lot of the money sent to her that was supposed to be sent to ACEVEDO

- ACEVEDO reached out to LAITINEN at some point

- She knew the money was drug proceeds

- The methamphetamine was vacuum sealed

- She witnessed three total packages arriving that contained crystal meth

### *Amy Kangas*

23. I found message conversations on FLETCHER's phones that corroborated this information.  For instance, I found the following messages from September 10th, 2025, between "Amy Kangas" and FLETCHER's phone.

9



24. Based on my training and experience, I know that a "ball" or "balls" is common drug slang for a quantity of drugs.  Specifically, a "ball" refers to approximately 1/8 of an ounce (3.54 grams) of a controlled substance, and "balls" refer to multiple quantities of that amount.

25. Additional messages from November 1, 2025 were recovered from FLETCHER's phone. These messages were direct text messages between Michael FLETCHER and "Amy Kangas." In the first message from November 1, 2025, KANGAS asks for "his number," which based on the investigation and the context of the messages I believe to be referring to Acevedo's number. FLETCHER responds with "He told me to find you though and sort shit out". I learned from the investigation that KANGAS allegedly had two packages sent to Edward Dorrow's residence in Ishpeming from ACEVEDO, while FLETCHER was in treatment. KANGAS failed

10

to pay ACEVEDO for the packages, which is what FLETCHER is referring to below.



26. Messages recovered from November 12, 2025, and 14, 2025, show the involvement of KANGAS utilizing a phone number ending in -1567 in helping sell methamphetamine for FLETCHER in a phone number ending in -4087.





31. Based on my training and experience, the November 12 messages relate to drug trafficking.  Specifically, in the first message FLETCHER asks how much "shit" KANGAS is looking for.  She responds: a "b," which based on my training and experience is another term for an eight-ball (3.54 grams).  Likewise, based on my training and experience, the November 14 messages relate to drug-trafficking messages, as (again) KANGAS talks about a "b" and then says she is "going to get rid of it and then grab another."  Based on my training and experience, KANGAS is saying that she has 3.54 grams of methamphetamine that she intends to sell, at which time she intends to get more from FLETCHER.

32. On February 25, 2026, I conducted a mirandized interview with Kangas outside of the Marquette County Jail prior to her being lodged for a bond violation and retail fraud. Kangas admitted to talking to ACEVEDO on Facebook to warn him about LAITINEN gambling FLETCHER's money. KANGAS also admitted to having a CashApp account of $Amylilkangas. KANGAS admitted to knowing FLETCHER was receiving methamphetamine in the mail from ACEVEDO. SUBJECT DEVICE 3 was seized at the end of the interview.

12

33. DEA S/A Akerley was able to get phone tolls via administrative subpoena associated with the number associated with Amy KANGAS (███████-1567). Eighth District Narcotics Intelligence Analyst Ron Koski was able to create a "hot list" of the common numbers called by KANGAS with relation to this conspiracy case. This does not include all numbers associated with this case. The number associated with ACEVEDO is the number that "Alexis Cruz Acevedo" provided to Chime and CashApp.  Based on my review of Chime and CashApp records, an account associated with Amy KANGAS and the phone number ███████-1567 sent ACEVEDO more than $10,000 between August and November 2025 via a combination of transfers in Chim and CashApp.

| Target | Percent | Count | Name | Min Date | Max Date |
|--------|---------|-------|------|----------|----------|
| (███-1567 | 93.0 | 19084 | LEGAL ADVOCATE 360 | 10/16/2025 | 02/19/2026 |
| (███-0513 | 4.3 | 888 | Michael Fletcher | 04/25/2025 | 09/21/2025 |
| (███-4087 | 1.5 | 299 | Michael Fletcher | 10/19/2025 | 11/21/2025 |
| (███-3557 | 0.9 | 184 | Kelsee Dupras | 08/01/2025 | 11/20/2025 |
| (███-8579 | 0.3 | 68 | ALEXIS ACEVEAO | 09/13/2025 | 09/23/2025 |

[1]

## C.  Analysis of Electronic Records

34. Based on my knowledge, training, experience, and the knowledge, training, and experience of other investigators, I know the following about forensic analysis of cellular telephones:

   a. Electronic devices, including cellular telephones, can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.  I also know that when a person switches from one for to a new phone, the new phone often contains the records (including, but not limited to, messages, calendar information, and photographs) from the old phone.  Operating systems such as Apple iOS and Google Android allow a user to bring over their old files to their new phone.  Further, individuals can restore old files to a new device through a backup.

---

[1] The analyst misspelled Acevedo when creating the chart.

b.  Cellular telephones have capabilities that allow them to serve as a wireless telephone, to serve as a digital camera and video camera, to access the Internet, to store electronic documents and files, to be used as a calendar/schedule appointments, and to do many of the same tasks that a computer can do.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

c.  Persons involved in trafficking controlled substances utilize cellular telephones to further their trafficking activities.  More specifically, I know that controlled substance distributors, members of controlled substance conspiracies, and controlled substance consumers use cellular telephones, including by:

   i.  Communicating with co-conspirators, suppliers, and customers by talking and by sending e-mail messages, text messages, and messages through social media (e.g., Facebook and Facebook Messenger);

   ii.  Storing contact information of co-conspirators, customers, and/or suppliers;

   iii.  Taking photographs of co-conspirators and contraband;

   iv.  Using the internet and internet-connected applications, including Cash App, to make purchases and transfer money with other co-conspirators, customers, and/or suppliers; and

   v.  Using mapping applications to navigate to "meet spots."

35. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

14

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

37. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

38. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.

39. In light of these difficulties, law enforcement intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B

### D. Conclusion

15

40. Based on the facts that Sierra LAITINEN and Amy KANGAS have previously been indicted in relation to this case. LAITINEN admitted to sending drug proceeds to ACEVEDO along with multiple messages showing LAITINEN clearly sent money to ACEVEDO and communicated with FLETCHER via Text, Facebook Messenger and WhatsApp. Messages between FLETCHER and KANGAS show clear drug communication with relation to procuring drugs from FLETCHER to sell and that both LAITINEN'S and KANGAS'S phones were seized from their person. I submit that there is probable cause to believe that violations of 21 U.S.C. § 841, 846, have occurred and further that evidence and instrumentalities will be found in the TARGET PHONES.